George F. SANZI et al.

v.

Taranath M. SHETTY, M.D., et al.

v.

Medical Malpractice Joint
Underwriting Association
of Rhode Island.

No. 2002–443–Appeal.

Supreme Court of Rhode Island.

Jan. 20, 2005.

Neil P. Philbin, Esq., Peace Dale, for Plaintiff.

Thomas R. Bender, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

**PER CURIAM.**

The defendants, Taranath M. Shetty, M.D., and Taranath M. Shetty, M.D., Inc., appeal from a Superior Court decision granting summary judgment in favor of third-party defendant Medical Malpractice Joint Underwriting Association of Rhode Island (JUA). This case came before the Court for oral argument on December 1, 2004, pursuant to an order directing all parties to appear and show cause why the issues raised in this appeal should not summarily be decided. After considering the arguments of counsel and examining the memoranda filed by the parties, we are of the opinion that cause has not been shown, and we will proceed to decide the case at this time. For the reasons stated below, we deny the defendants' appeal.

### Facts and Travel

From March 1979 until March 1987, Rebecca Caldarone was a patient of defendant, pediatric neurologist Dr. Taranath M. Shetty.[1] Tragically, Mrs. Caldarone committed suicide in December 1999, jumping to her premature death from the Jamestown Bridge and leaving behind a husband and two young children. The next year, plaintiffs, Caldarone's parents, George and Joan Sanzi, and husband, Dennis Caldarone, as parent and next friend of Caldarone's minor children, Ryan and Joseph Caldarone, brought suit against Dr. Shetty and Taranath M. Shetty, M.D., Inc., alleging that Dr. Shetty sexually abused and battered Caldarone for a period of eight years, beginning when she was just fourteen years old. This, they claim, led to her suicide and untimely death.[2] When

---

1. Doctor Shetty's medical license has been suspended by the Rhode Island Department of Health Board of Medical Licensure and Discipline.

2. The civil suit against Dr. Shetty and Taranath M. Shetty, Inc. has since been dismissed, with prejudice, upon the agreement of the parties.

he was sued, Dr. Shetty contacted his professional liability insurer, Medical Malpractice Joint Underwriting Association of Rhode Island for defense and indemnification coverage.

JUA denied coverage, however, asserting that neither Dr. Shetty nor Taranath M. Shetty, M.D., Inc. (Shetty, Inc.), was entitled to defense or indemnity for the claims lodged by plaintiffs. As a result, Dr. Shetty brought a third-party complaint requesting a determination that JUA has a duty to defend and/or indemnify both himself and Shetty, Inc., and demanding judgment against JUA for all sums potentially adjudged against them. JUA filed a motion for summary judgment which was granted by a hearing justice, who found that JUA had no duty to defend or indemnify and thus was entitled to judgment as a matter of law. The defendants timely appealed, arguing that (1) plaintiffs' complaint fulfills the requirements of the pleadings test[3] because it alleges facts sufficient to bring their claims within the coverage defined in the relevant policy, and (2) that a genuine issue of material fact exists about whether or not the JUA policy should be read to provide medical malpractice insurance coverage for injury arising out of sexual misconduct.

### Standard of Review

■ "It is well settled that this Court reviews the granting of a summary judgment motion on a *de novo* basis." *M & B Realty, Inc. v. Duval,* 767 A.2d 60, 63 (R.I.2001) (citing *Marr Scaffolding Co. v. Fairground Forms, Inc.,* 682 A.2d 455, 457 (R.I.1996)). "In conducting such a review, we are bound by the same rules and stan-

dards as those employed by the trial justice." *Id.* at 63. "[A] party who opposes a motion for summary judgment carries the burden of proving by competent evidence the existence of a disputed material issue of fact and cannot rest on allegations or denials in the pleadings or on conclusions or legal opinions." *Accent Store Design, Inc. v. Marathon House, Inc.,* 674 A.2d 1223, 1225 (R.I.1996). " 'To oppose a motion for summary judgment successfully, a party need only provide the trial justice with evidence that, when viewed in light most favorable to that party, establishes the existence of a genuine issue of a material fact.' " *M B Realty,* 767 A.2d at 63–64. "[W]e will affirm a summary judgment if, after reviewing the admissible evidence in the light most favorable to the nonmoving party, we conclude that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law." *Woodland Manor III Associates v. R.E. Keeney,* 713 A.2d 806, 810 (R.I.1998) (quoting *Rotelli v. Catanzaro,* 686 A.2d 91, 93 (R.I.1996)).

### Analysis

■ Doctor Shetty posits both that plaintiffs' complaint passes the pleadings test so that JUA is obligated to defend and indemnify him, and further that a genuine issue of material fact exists as to whether JUA intended to cover injuries arising out of sexual misconduct with respect to the polices in effect between 1978 and 1980. The primary issue to be addressed in this appeal is whether plaintiffs' complaint alleges facts sufficient to fall under the umbrella of Dr. Shetty's JUA coverage for

---

**3.** The pleadings test "requires the trial court to look at the allegations contained in the complaint, and 'if the pleadings recite facts bringing the injury complained of within coverage of the insurance policy, the insurer must defend irrespective of the insured's ulti-

mate liability to the plaintiff.' " *Peerless Insurance Co. v. Viegas,* 667 A.2d 785, 787 (R.I. 1995) (quoting *Employers' Fire Insurance Co. v. Beals,* 103 R.I. 623, 632, 240 A.2d 397, 402 (1968)).

the period during which the alleged sexual abuse of Rebecca Caldarone took place. In their complaint, plaintiffs alleged that Dr. Shetty sexually assaulted and battered Rebecca, beginning when she was his fourteen-year-old patient. They allege that Shetty deliberately and falsely deceived Rebecca's parents into believing that it would be beneficial to Rebecca's health to spend her Saturdays working at his office. All the while, they allege, between 1979 and 1987, Shetty sexually abused Rebecca both during regular medical visits and on the purported Saturday workdays.

Although Rebecca terminated the doctor-patient relationship in March 1987, plaintiffs assert that the effects of the alleged sexual abuse suffered at the hands of Dr. Shetty haunted her for many years. Unable to cope any longer, she eventually took her own life. Believing that Shetty's lecherous actions were the cause of Rebecca's tortured life and eventual suicide, plaintiffs filed a wrongful death action, alleging tortious battery upon the decedent, intentional infliction of emotional distress upon the decedent and her parents, fraud, and respondeat superior liability imputed to Shetty, Inc. Because of the nature of these claims, JUA contends that under Shetty's insurance policies there is no obligation to defend or indemnify Dr. Shetty or Shetty, Inc.

A brief synopsis of the relevant policies and the time frames covered is necessary to analyze defendant's claims to coverage. From March 23, 1978, through March 23, 1980, defendants were covered by policies JUA–7301, 8809, both of which were issued on JUA form L–9285. The policies provided:

"The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of: (Coverage M—Individual Professional Liability) injury arising out of the rendering of or failure to render, during the policy period, *professional services* by the individual insured, * * * performed in the practice of the individual insured's profession * * *; and (Coverage N—Partnership Liability) injury arising out of the rendering of or failure to render during the policy period, *professional services* in the practice of the profession described * * *." (Emphases added.)

The policies also contain the following condition regarding the insured's duties in the event of occurrence, claim or suit:

"In the event of an *occurrence,* written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given * * * to the company * * * as soon as practicable." (Emphasis added.)

Contained within the definitions section of the policy, "occurrence" is described as "an *accident,* including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." (Emphasis added.)

Beginning in March 1980, the one-year policies issued to Shetty were substantially similar to the earlier policies, but included the following significant exclusion:

"This insurance does not apply: (a) to injury arising out of the performance by the insured of a criminal act." [4]

In their third-party complaint, defendants contend that plaintiffs' allegations fall

---

**4.** The relevant policies containing the criminal act exclusion were issued on form JUA– 20.

within the policy's range of coverage, and also that because the policies in effect between March 1978 and March 1980 do not contain the criminal act exclusion, defendants are entitled to defense and indemnity coverage for those periods.

It is well established that "[a]n insurer's duty to defend is a function of the allegations in the complaint filed against the insured[,]" and that "[i]f the allegations bring the case within the scope of the risks covered by the policy, the insurer must defend regardless of whether the allegations are 'groundless, false or fraudulent.'" *Craven v. Metropolitan Property and Casualty Insurance Co.*, 693 A.2d 1022, 1022 (R.I.1997) (mem.) (quoting *Peerless Insurance Co. v. Viegas*, 667 A.2d 785, 787 (R.I. 1995)). Therefore, in the instant appeal, the question of whether JUA has a duty to defend and potentially indemnify the insured is multi-tiered. First, does the complaint meet the requirements of the pleadings test? Second, what is the relevance of the pleadings test to the situation presented here? Third, do the alleged actions fall within the "professional services" umbrella, and if so, does the policy's definition of "occurrences" encompass allegations of intentional sexual abuse? Finally, does the lack of a criminal-act exclusion in Form L–9285 imply that the policy was intended to cover such claims?

We agree with the hearing justice's determination that even if the pleadings test were the only consideration here, Shetty's claim would fail because the claim against him does not allege injury arising from the rendering or failure to render professional services. Thus, there is no claim against him within the sphere of risks insured by the policy. *See Employers' Fire Insurance Co. v. Beals*, 103 R.I. 623, 631, 240 A.2d 397, 402 (1968). We also agree with the hearing justice's ruling that the only connection between Shetty's acts and his profession is that the molestation of this young girl occurred at his office. This tenuous geographic link will not alone trigger a duty to indemnify or even defend.

Most courts across the nation are in harmony with the rule that intentional sexual abuse does not fall within the rendering of professional services for the purposes of insurance coverage unless the acts are so inextricably intertwined with medical treatment that coverage must be afforded. *Marx v. Hartford Accident and Indemnity Co.*, 183 Neb. 12, 157 N.W.2d 870 (1968), the seminal case in this area, provides that "[i]n determining whether a particular act is of a professional nature or a 'professional service' we must look not to the title or character of the party performing the act, but to the act itself." *Id.* at 872. "Something more than an act flowing from mere employment or vocation is essential. The act or service must be such as exacts the use or application of special learning or attainments of some kind." *Id.* at 871–72. Applying this logic, courts have determined that in the medical field, doctors accused of sexual abuse are generally not protected by the "professional services" language.[5]

---

5. *See generally Roe v. Federal Insurance Co.*, 412 Mass. 43, 587 N.E.2d 214 (1992) (holding that because a dentist's practice consists of working on teeth and has no relation to the alleged sexual acts, sexual molestation of a patient during office visits did not warrant coverage under a "professional services" insurance policy provision); *Smith v. St. Paul Fire & Marine Insurance Co.*, 353 N.W.2d 130 (Minn.1984) (finding that general practitioner's sexual abuse of minor patients did not constitute "professional services" because they were independent of medical treatment, and committed merely for the satisfaction of the doctor's own prurient interests); *Niedzielski v. St. Paul Fire & Marine Insurance Co.*, 134 N.H. 141, 589 A.2d 130, 132 (1991) (determining that a dentist's sexual assault of a ten year-old patient during a dental exam was not covered by professional liability insur-

Those courts that have extended coverage under the "professional services" provision generally have done so only after determining that the tortious conduct was "intertwined with and inseparable from the services provided." *St. Paul Fire Marine Insurance Co. v. Asbury,* 149 Ariz. 565, 720 P.2d 540, 542 (Ct.App.1986). In *Asbury,* the Court affirmed a trial courts determination that because a gynecologists alleged intentional and improper manipulations of his patients bodies "took place in the course of and as an inseparable part of the providing of professional services," "any damages would be those resulting from the providing of professional services by the insured." *Id.* at 541. *See also St. Paul Fire and Marine Insurance Co. v. Shernow,* 222 Conn. 823, 610 A.2d 1281, 1285 (1992) (holding that "[w]hen the medically negligent procedure is so inextricably intertwined and inseparable from the intentional conduct that serves as the basis for the separate claim of a sexual assault, we join with those jurisdictions that conclude that professional liability policies must, in such instances, extend coverage"). The Supreme Court of New Jersey applied an even broader standard to a case in which an insurer balked at defending and satisfying any judgment stemming from a gynecologists sexual assault of a patient during a medical exam. *See Princeton Insurance Co. v. Chunmuang,* 151 N.J. 80, 698 A.2d 9, 11 (1997). The *Princeton* court rejected the *Marx* line of thinking, and instead held that any injury originating from, growing out of, or having

a substantial nexus with the rendering of professional services would fall within the professional services coverage. *Id.* at 16. Therefore, the court determined that because the sexual assault took place in the doctors office, sufficient nexus existed between the context in which the acts took place and the services sought by the victim. *Id.* at 18.[6]

We have not had the opportunity to address the issue of insurance coverage in a case involving a medical professional accused of sexual misconduct. However, previously this Court has adopted, though in a factually different scenario, the reasoning of *Marx* and its progeny and we decline to deviate from that reasoning today. *See generally Vigue v. John E. Fogarty Memorial Hospital,* 481 A.2d 1 (R.I. 1984) (applying the *Marx* rule to determine whether hospital employees actions were performed in the course of "professional services"). Therefore, we look not to Shettys title or vocation, but to the acts and circumstances surrounding the alleged assaults. Here, professional services are remotely incidental to what is alleged in the complaint, since Shettys professional status merely served the function of allowing the perpetrator access to the victim. Shettys alleged sexual abuse of Rebecca Caldarone was so distinct from his medical skills, training, and practice in pediatric neurology, that the alleged abuse clearly falls outside the scope of "professional services." Consequently, we hold that in the instant matter the accusations of sexual abuse leveled at Dr. Shetty do not fall

---

ance, and that the child's presence in the dentist's office did not justify "a characterization which would label every act occurring in that office a professional service or failure to provide a professional service,"); *Physicians Insurance Co. v. Pistone,* 555 Pa. 616, 726 A.2d 339 (1999) (refusing to find policy coverage under "professional services" provision for allegations that physician exposed and

masturbated himself in front of patient, and finding that physician's acts failed to conform to any definition of medical skill or service).

6. The divided *Princeton* court ultimately held, however, that because the insurance policy contained a criminal act exclusion, coverage was barred. *Princeton Insurance Co. v. Chunmuang,* 698 A.2d 9, 18 (N.J.1997).

within the "professional services" coverage of JUAs professional liability policy.

Had the distinction between the allegations and Shettys own "professional services" been less distinct, our holding nonetheless would be the same, because "this Court has recognized an exception to [the pleadings test] in cases involving civil actions for damages flowing from an alleged sexual molestation." *American Commerce Insurance Co. v. Porto,* 811 A.2d 1185, 1190 (R.I.2002) (holding that an insurer had no duty to defend or indemnify defendant Boy Scout leader for claims arising out of co-troop-leaders sexual abuse of troop member when defendants homeowners policy had specific exclusion for claims arising out of sexual molestation). In *Peerless Insurance Co. v. Viegas,* 667 A.2d 785, 788 (R.I.1995), we adopted the inferred intent doctrine, which states that "because injury always ensues [from the sexual molestation of children], the offender is deemed to intend any injury resulting from the act as a matter of law." Therefore, we held that "[i]n civil actions for damages that result from an act of child molestation, an insurer will be relieved from its duty to defend and to indemnify its insured if the perpetrator is insured under a policy in which there is contained an intentional act exclusion provision." *Id.* at 789. Further, in *Craven,* 693 A.2d at 1022, this Court extended the *Peerless* reasoning to a policy that did not contain a specific intentional act exclusion provision.[7] The policy at issue in *Craven* specified that coverage would apply to injury arising out of an "occurrence," and defined occurrence

as an "accident," in terms nearly identical to those in Shettys policy.[8] Therefore, we held that where intentional acts are alleged, there is no "accident," and therefore no "occurrence" to fall within the policys coverage. *Id.*

Coverage in the policies at issue is triggered by the happening of an accidental occurrence. The plaintiffs complaint contains five counts, all of which stem from Shettys alleged sexual abuse of Rebecca Caldarone. Because the alleged sexual abuse carries with it an inferred intent to harm, there is no accidental nature to the resulting injuries. Consequently, under the principles articulated in *Peerless* and *Craven,* the inferred intent rule applies to relieve JUA from its duty to defend or indemnify Shetty for injuries arising out of the alleged intentional sexual assaults of Rebecca Caldarone.

 Finally, the defendants argue that the lack of a criminal acts exclusion in JUA Form L–9285, in effect between March 1978 and March 1980, implies that coverage for injuries arising out of criminal acts was included in those policies. In their efforts to secure a reversal of summary judgment, the defendants claim ambiguity in Form L–9285 sufficient to create a genuine issue of material fact. However, we see little merit in this argument and identify nothing ambiguous in the terms of the insurance policy. When determining coverage, "[w]e look not at what the insurer may have intended the policy to cover or exclude, but rather what an ordinary reader of the policy would have understood the policys terms to mean if he or she had

7. In *Town of Cumberland v. Rhode Island Interlocal Risk Management Trust, Inc.,* 860 A.2d 1210, 1219 (R.I.2004), we held, however, that "Rhode Island public policy does not bar an insured from indemnification for intentional torts when the insurance policy explicitly provides such coverage."

8. The *Craven* policy defined occurrence as "accident, including continuous or repeated exposure to substantially the same general harmful conditions, resulting in **bodily injury** * * *." *Craven v. Metropolitan Property and Casualty Insurance Co.,* 693 A.2d 1022, 1022 (R.I.1997) (mem.).

read them." *Porto,* 811 A.2d at 1192. We see nothing in the earlier policies that would lead the ordinary reader to conclude that criminal-acts or sexual-abuse coverage was included. The simple fact that later policies provide a specific exclusion does not mandate the inclusion of that coverage in the earlier policies. More profoundly, it is sufficient that the policies under Form L–9285 do not provide coverage for intentional acts. In our opinion, under the facts presented in this case, summary judgment in favor of JUA was warranted, for there exists no genuine issue of material fact about whether JUA has a duty to defend or indemnify the defendants.

## Conclusion

We conclude that because JUA has no duty to defend or indemnify the defendants for the matters alleged by the plaintiffs, summary judgment was warranted. Therefore, we deny the defendants' appeal and affirm the judgment of the Superior Court, to which we return the papers in this case.